# EXHIBIT B

JAMS ARBITRATION
No. 5425003089

**BRIGADE TALENT LLC**

**Claimant,**

and

**ERIN DANA LICHY,**

**Respondent.**

---

FINAL AWARD

1. Parties: Brigade Talent LLC (Claimant)

   Erin Dana Lichy (Respondent)

2. Attorneys: Peter Fox, Esq. (Claimant)
Schoolidge Peters Rusotti & Fox LLP
2 Park Avenue
20th Floor
New York, New York 10016
Tel.: 212-729-7708
Email: pfox@sprfllp.com

   Abraham Lichy, Esq. (Respondent)
222 East 68th Street
New York, New York 10065
Tel.: 917-561-1172
Email: alichy@lichylaw.com

3. Arbitrator: Michael H. Dolinger
JAMS
620 Eighth Avenue
16th/34th Floors
New York, New York 10018

| | |
|---|---|
| 4. Case Manager & Case Coordinator: | Patrick Palmer<br>Kathryn Silhan<br>JAMS<br>620 Eighth Avenue<br>16th/34th Floors<br>New York, New York 10018<br>Tel.: 212-607-2788<br>212-607-2711<br>Email: ppalmer@jamsadr.com<br>ksilhan@jamsadr.com |

5. Claimant Brigade Talent LLC, a talent management company, commenced this arbitral proceeding, pursuant to the parties' Representation Agreement (para. 17) to recover commissions allegedly owed to it by respondent Erin Lichy, a self-described "reality television personality". Under their Representation Agreement, executed October 28, 2022, Brigade was to provide management services for Ms. Lichy, and was to receive commission payments from the revenue earned by respondent. As defined by the parties' initial pleadings, their dispute arose from a disagreement about Ms. Lichy's obligation to pay Brigade commissions for revenues from endorsement deals earned during the 180 days following Ms. Lichy's termination of the Agreement, an event that occurred effective May 15, 2024. (Ms. Lichy gave notice of termination on February 15, 2024, triggering a 90-day period until effective termination.) Brigade asserted that it was entitled to payment of a percentage of all revenues received from endorsement deals during the post-termination 180-day period, irrespective of whether Brigade had been involved in bringing about those deals. In contrast, Ms. Lichy contended that, under the Representation Agreement, Brigade was entitled to post-termination commissions only on deals in which it had been involved, that is, deals arrived at or negotiated prior to contract termination.

6. At the outset, the parties both initially moved for partial summary disposition based on their respective interpretations of the relevant provisions of the contract, although respondent subsequently withdrew her motion. (Scheduling Orders No. 1, para. 12 & No. 2, para. 5). Based on that briefing, we then issued a Partial Interim Award in which we upheld claimant's interpretation of paragraphs 2 and 3 of the Agreement, concluding that Brigade was entitled to be paid on all revenues

from endorsement deals received during the 180 days following termination. Under the terms of the Representation Agreement, commissions for revenue received during the first 90 days (the First Follow-On Period) were to be calculated at 20 percent, and revenues received during the second 90 days (the Second Follow-On Period) were to be calculated at ten percent.

7. In the wake of that decision, respondent filed an amended answer to the Statement of Claim, in which she asserted four affirmative defenses. One defense asserted that the Representation Agreement had been amended by the parties in March 2024 to reduce the commission percentages and to radically narrow the universe of post-termination deals on which commissions must be paid. The additional new defenses invoked a contract-breach allegation based principally on Brigade having assertedly mishandled an alleged opportunity for a November 2023 deal for an appearance at an Amazon-sponsored holiday event. Separately, she invoked waiver and equitable estoppel to compel compliance with her asserted amendment of the Representation Agreement, and she also sought a set-off based on the contract-breach allegations.

8. With the completion of pre-hearing discovery, we conducted a one-day arbitral hearing on September 30, 2025, followed by post-hearing briefing.[1] (Oct. 30, 2025 Cl. Brief; Oct. 30, 2025 Resp. Brief; Nov. 6, 2025 Cl. Reply; Nov. 7, 2025 Resp. Reply). We have since issued a Second Interim Award in which we held that the parties were bound by the Representation Agreement, as we interpreted it in the Partial Interim Award, and rejected respondents' various affirmative defenses, including the contention that the parties had agreed to amend the Representation Agreement. We therefore found, based on facts stipulated by the parties, that respondent owed claimant $43,710.00 in commissions (2d Interim Award, 25-26), and further ruled that Brigade should recover pre-judgment interest, as well as arbitral payments that it had advanced to cover respondents' share of JAMS fees and its own arbitral fee expenses. (Id., 26). To allow for quantification of those amounts, we directed claimant to file an application, with documentation, and authorized responding papers by respondent. We have since received full briefing by the parties (Cl. Jan. 29, 2026 Int. &

[1] Prior to the hearing, we clarified that the scope of the claim by claimant was limited to revenues for endorsement agreements realized during the 180-day period following termination on May 15, 2024. (Scheduling Order No. 7, para. 5(2)(a)).

Fee Motion; Resp. Feb. 5, 2026 Opp.; Cl. Feb. 10, 2026 Reply), resolution of which in this Award will complete proceedings in this arbitration. As a first step, and in the interest of completeness, we first insert here a largely in haec verba reproduction of the relevant portions of the Partial Interim Award, addressing the interpretive dispute concerning paragraphs 2 and 3 of the Representation Agreement, and the Second Interim Award, addressing liability and damages, and then turn to the issues left for adjudication at the hearing.

* * *

PARTIAL INTERIM AWARD (July 2, 2025)

At the outset of this litigation, claimant Brigade Talent LLC has moved for partial summary disposition. It seeks a ruling that for the 180-day period following termination of the parties' Representation Agreement, respondent Erin Lichy was obligated to pay a commission on any revenue earned during that post-termination period. Respondent opposes the motion, arguing that she was obliged to pay only for revenues attributable to deals negotiated or arrived at prior to the contract termination. In articulating her reading of the contract, respondent now does not seek summary disposition, arguing instead solely that there are triable issues of fact regarding the meaning of the relevant provisions.[2] We address this dispute in brief terms.

Background

Respondent is self-described as a "reality television personality, appearing on the television show 'The Real Housewives of New York'." (Answer, para. 4). Claimant is a talent management company. (Id., para. 3). The parties entered into a Representation Agreement on October 28, 2022, which called for Brigade to provide management services to Ms. Lichy and for claimant to pay commissions for those services according to a contractual formula. (Id., para. 5).

On February 15, 2024, respondent gave Brigade 90-day notice of termination under section 2(a) of the Agreement; the termination was therefore effective May 15, 2024. (Id., 11). During the following 180 days, Ms. Lichy entered into various

[2] Respondent initially also moved for summary disposition, but withdrew that motion upon the discovery that her papers had relied on non-existent or inapplicable legal authority (a casualty from the use of AI).

endorsement agreements, triggering revenue to her within that period. (Id., paras. 12-13). During the same period, she also continued to receive revenue from several endorsement deals that had been entered into during the term of the Representation Agreement. She has paid, or acknowledged owing, Brigade commissions on the deals that predated the termination of the Agreement. (Id., pgs. 3-4). Apart from these transactions, Brigade has demanded payment of commissions on the deals that were arrived at during the 180 days postdating the termination of the Representation Agreement. In support of this demand, Brigade cites both paragraphs 2(b) and 3 of that Agreement. Respondent has declined to make payment, asserting that the Agreement did not oblige her to do so, with emphasis on paragraph 2(a) of the contract. That dispute triggered the current arbitration.[3]

The Relevant Contract Terms

The parties' Agreement appointed Brigade as respondent's "exclusive personal manager" worldwide, a role that involved "counsel[ing]" Ms. Lichy "on all income producing opportunities", evaluating "requests, "market[ing]" her, "interact[ing] with clients", handling the billing, collecting and disbursing of revenues and providing advice on all these activities. (Resp. Ex. A, para. 1). Given these responsibilities, Brigade was to receive "a twenty percent (20%) commission on all gross revenue arising from any and all commercial opportunities . . . negotiated or entered into during the Term . . . ." (Id., para. 3).

With either party empowered to terminate the Agreement on "90 days written notice" (id., para. 2(a)), the contract also dealt with the matter of commissions for revenue earned or received post-termination. Paragraph 2(a) provided that "[i]f and when this Agreement terminates, the terms hereof will nevertheless continue to apply to all assignments accepted by you during the Term of this Agreement, or for which negotiations commenced prior to the effective termination date." Paragraph 2(b) then dealt with payment of commissions on new projects entered into during the 180 days following effective

[3] Apart from denying a contractual obligation to pay commissions on the targeted post-termination deals, respondent asserts two affirmative defenses seemingly premised on the contention that Brigade breached its contractual obligations. (Answer, paras. 21 & 22). These defenses are not at issue on the current motion.

termination. It stated: "For a period of ninety (90) days following the termination of this Agreement ("First Follow-On Period") we shall be entitled to collect our Commission on all assignments accepted by you during the First Follow-On Period. Immediately following the expiration of the First Follow-On Period, and for an additional ninety (90) days thereafter ("Second Follow-On Period"), we shall be entitled to collect one-half of our Commission on all assignments accepted by you."

The current dispute turns on whether, for the two 90-day post-termination periods, respondent must pay commissions for revenue received from deals entered into during those two periods and without the involvement of Brigade. Claimant asserts that it is entitled to commissions on any transactions closed by respondent in those 180 days, and irrespective of Brigade's non-involvement in the transactions, while respondent urges that she is not obliged to pay commissions on revenue from deals not negotiated or signed during the term of the Representation Agreement, or at least that there are triable issues when seeking to divine the meaning of the quoted terms.[4]

[4] It should be noted that paragraph 3 – previously quoted regarding commissions for revenues generated during the term of the Representation Agreement – refers to commissions for the two Follow-On Periods as covering any deals "negotiated or entered into during . . . the First Follow-On Period or the Second Follow-On Period" This framing appears broader than the terms found in paragraph 2(b), which says that commissions are triggered by deals "accepted by you" during those two Follow-On Periods. We understand that the current dispute concerns only deals accepted by Ms. Lichy during the Follow-On Periods.

General Standards

The parties initially agreed to pursue mirror-image motions for partial summary disposition, in order to obtain a potentially definitive ruling at the outset of the case on this controlling dispute.[5] As noted, currently only claimant's motion is extant. In assessing that motion, we may deem it the functional equivalent of a motion for judgment on the pleadings (e.g., Fed. R. Civ. P. 12(c)) or summary judgment (e.g., Fed. R. Civ. P. 56). Since, however, the parties do not offer any evidence other than the terms of the Representation Agreement, our conclusion does not change however the motion is characterized. In brief, in a case focused on the meaning of a contract, we are to look to whether the relevant terms are unambiguous, that is, whether their meaning is so clear that it is not subject to reasonable dispute. We thus look in the first instance to whether the terms have a plain meaning. See, e.g., Brooke Group v. JCH Syndicate, 87 N.Y.2d 530, 534, 640 N.Y.S.2d 479, 482 (1996). In assessing those terms, "the court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." Currier, McCabe & Assocs., Inc. v. Maher, 75 A.D.3d 889, 890-91, 906 N.Y.S.2d 129, 131-32 (3d Dep't 2010)(quoting Atwater & Co. v. Panama R.R. Co., 246 N.Y. 519, 524, 159 N.E. 418 (1927)). In this case, the heart of the dispute is found in the provisions of the parties' Representation Agreement, and the litigants do not proffer evidence beyond the quoted terms of the Agreement.[6]

Assessment: The Merits

In pressing for payment of commissions on deals postdating termination, Brigade focuses on the terms of paragraph 2(b), which requires payment of commissions "on all assignments accepted by you" during either the First or the Second Follow-On Periods. It finds further support from the partially equivalent language in paragraph 3, which defines the commission formula and also states that the commissions are payable, inter alia,

[5] We understand that the amount in dispute may approximate $30,000.00.

[6] At one point respondent invoked industry practice regarding sunset provisions and cited two advice articles about terms to include in representation agreements. (Resp. Opp., 5 n.1). In the face of an unambiguous provision, such evidence would normally be inadmissible, but in any event the cited passages are consistent with claimant's interpretation of the Agreement.

for "any and all commercial opportunities . . . entered into during" either of the two Follow-On Periods. Both of these provisions appear to require, in plain and unambiguous language, that Ms. Lichy pay the specified commission for deals that she entered into during the 180 days following termination.

In resisting this conclusion, respondent leans on the argument that the controlling provision of the Representation Agreement regarding commissions is paragraph 2(a), which provides that, upon termination, the terms of the agreement "will nevertheless continue to apply to all assignments accepted by you during the Term of this Agreement or for which negotiations commenced prior to the effective termination date." Respondent treats that language as the exclusive provision governing commission obligations, and suggests that paragraphs 2(b) and 3 serve other purposes than to impose terms governing the payment of commissions for post-termination deals. (Resp. Opp., second page & pgs. 4-6). If so, since the deals at issue here were neither negotiated nor entered into prior to May 15, 2024, respondent would have no obligation to pay commissions on them.

This reasoning is unpersuasive. The wording of paragraph 2(b) is explicit and defines an obligation to pay commissions on deals entered into within 180 days following May 15, 2024. Given that unalterable fact, respondent's argument would, in effect, treat that portion of paragraph 2(b) as mere surplusage. We are obliged, however, to give meaning to all terms of a contract if that is possible, see, e.g., In re Viking Pump, Inc., 27 N.Y.3d 244, 253, 33 N.Y.S.3d 118 (2016); Beal Savings Bank v. Sommer, 8 N.Y.3d 318, 324-25, 834 N.Y.S.2d 44 (2007), and that is readily accomplished here by adhering to the plain meaning of the quoted language.

Respondent's further implication that the quoted language from paragraph 2(b) -- as interpreted by claimant -- would be in conflict with paragraph 2(a) and is thus properly overridden or read solely to "dictate[] the applicable rate for qualifying deals (*i.e.*, those covered under Section 2(a)" Resp. Opp., 4) is meritless. These two provisions address separate, though related, issues. Paragraph 2(a) defines the consequences of termination for deals consummated or negotiated prior to the termination of the Agreement. Paragraph 2(b) concerns the commission-related effect of termination on transactions that entirely post-date the termination but come within one of the

two 90-day post-termination windows. These provisions are plainly consistent and reconcilable with each other, and present no occasion to ignore or mangle one or the other.

While respondent cites several arguable inconsistencies in wording of the cited provisions, none offers an occasion to ignore the provisions that define respondent's obligation to pay a commission for the transactions that are in current dispute. For example, she points to the fact that paragraph 3 refers to "opportunities" whereas paragraphs 2(a) and 2(b) refer to "assignments". (Id., first-second pgs.). In context, these terms plainly refer to the same thing -- an agreement between Ms. Lichy and a company to enlist her endorsement services in exchange for a fee. Equally flawed is respondent's suggestion that the reference to the commission rate in paragraph 3 (20 percent) is inconsistent with paragraph 2(b) (which refers to 20 percent for the First Follow-On Period and 10 percent for the Second Follow-On Period), and that this difference should doom the current motion. (Id., 5). Paragraph 3 is describing the basic commission rate, while paragraph 2(b) is adding a variation keyed to the specifics of the Second Follow-On Period, which it defines. Although there is a tension on this point between the two provisions, claimant is not contesting the fact that the applicable rate for the Second Follow-On Period is ten percent. In any case, however that arguable difference is resolved, it would not excuse respondent from the payment of the applicable commission (whatever rate it carries), and thus is irrelevant to the narrow issue that we are addressing on claimant's current motion.

We also note one other potential inconsistency but observe that it appears immaterial for purposes of the dispute aired in this case. Paragraph 2(b) describes the First Follow-On Period as covering deals "accepted by you during" that Period. In seeming contrast, paragraph 3 states that the commission during the Follow-On Period is due if the deal "was **negotiated** or entered into during" the Follow-On Period. (Emphasis added.). It appears that the deals at issue in this case were entered into during the 180-day period, and thus the conflict as to the effect, if any, of negotiations during the Follow-On Period, but with execution after the 180-day window, would not be encountered.

In a further effort to block partial summary disposition, respondent argues that enforcing a commission obligation for

transactions on which Brigade contributed no effort would be inequitable. She also suggests that a liberal reading of paragraph 2(b) might expose her to having to pay Brigade for all sorts of irrelevant revenues that she earned on her own, including, for example, profits on a real estate transaction. (See Resp. Opp., first pg. & pg. 7). We do not agree with either point.

Equity is not called into question here, as the contract plainly contemplated the potential that, after termination, respondent would be called upon to pay commissions on relevant revenues in the absence of involvement by Brigade. As noted, the Agreement specified that commissions will be required if a deal was agreed to, or even negotiated, during the 180-day post-termination period, and it included no requirement that Brigade somehow be involved in that transaction as a predicate to earning a commission. To the contrary, paragraphs 2(b) and 3 contemplated a commission trigger for deals negotiated and entered into post-termination, a scenario in which Brigade would almost certainly not be involved. Given that circumstance, had the parties intended that commissions for post-termination deals would be predicated on Brigade involvement, they would presumably have included language so stating. In addition, the inclusion of the sunset provision of paragraph 2(b) -- which contemplated a reduced commission in the Second Follow-On Period -- appears to reflect the understanding that a temporally limited post-termination diminishing rate based on all revenues received for a limited time would fairly compensate the manager post-termination for benefits conferred on the client during the contractual term but only realized post-termination.

As for respondent's allusion to the possibility of commissions being required for unrelated transactions that yielded revenue to Ms. Lichy, that is plainly wide of the mark. The subject matter of Brigade's representation of Ms. Lichy involved endorsement agreements and possibly similar endeavors. Although the Agreement did not define the subject matter of the contractual business with precision, its scope would be a subject, if necessary, of litigation to define its outer limits, should claimant seek a share of revenues far afield from the topic of the parties' relationship. In any event, there is no suggestion thus far in this case that Brigade is seeking a share of transactions not within the subject matter of the parties' former contractual relationship.

## CONCLUSION

For the reasons stated, claimant's motion for partial summary disposition is granted.

* * * *

## SECOND INTERIM AWARD (January 15, 2026)

We now turn to the merits in light of the arbitral hearing and subsequent briefing.

### The Parties' Positions

Brigade relies on our earlier ruling that it is entitled to commissions on all endorsement deals realized in the 180 days postdating termination of the Representation Agreement. Based on the stipulated amounts of those transactions and their timing (Tr. 16-17; CXs 30, 31), Brigade seeks an award of commissions totaling $43,710 (Cl. Brief, 7-8), as well as an award of prejudgment interest, arbitral costs and reimbursement of arbitral fees paid as advances for respondent.

Consistent with respondent's Amended Answer, she argues that the Representation Agreement was substantially amended by an email exchange on March 4 and 11, 2024, thus limiting claimant to receipt of commissions on only three deals and at half the rates mandated in the Representation Agreement, and she further asserts that the 180-day post-termination period for generating commissions has been shortened by one month. In addition, respondent invokes theories of waiver and equitable estoppel to limit the size of any commissions owed under the Agreement. She further seeks a set-off to account for her damages from Brigade's alleged breach of its contractual obligations, which assertedly cost her an appearance fee at an Amazon event. Finally, she seems to suggest that we deny claimant any recovery, premised in major part on alleged violation of its ethical and contractual obligations, embodied in a false representation as to the contents of a brand list that Brigade provided to respondents as part of its March

11, 2024 email regarding possible amendment of the Representation Agreement.

Faced with respondent's new assertion of a contractual amendment, claimant argues that there was no meeting of the minds sufficient to bind it to a proposed set of changes pressed by Ms. Lichy. It also asserts that even if it were deemed to have acceded to some of the proposed amendments, that concession is unenforceable for lack of any consideration and the absence of a qualifying signed writing. Claimant also contests respondent's waiver and estoppel defenses, and further argues that its dealings with the Amazon representative never breached the Agreement.

Ms. Lichy responds, regarding the contract amendment issue, that there was consideration, that the email exchange of March 4 and 11, 2024 suffices as a signed writing and that in any event the parties' conduct postdating May 15, 2024 is directly traceable to the alleged March 11 modification, thus excusing the absence of a signed writing.

Assessment

The Contract Amendment Defense

The respondent's contention that the Representation Agreement was materially altered traces back to an email sent by Ms. Lichy's business representative and counsel, Abraham Lichy, to Max Stein, the Brigade CEO, on March 4, 2024. That event occurred partway through the 90-day period between the notice of termination and effective termination, which was to occur on May 15, 2024. In the March 4 email, Mr. Lichy observed that he had "some thoughts to this and have the following proposal, but if you have thoughts to the contrary, I'm always happy to talk". He then proposed the following: "1. Until May 15 – you get 10% of anything from any deal if brought under a new manager or Gersh.[[7]] If no new manager (and Gersh) are involved, you would get the 20% though. 2. May 15 – August 15 – you get 10% on any deals that are with companies you either previously got deals for Erin or made introductions to. But no commission on deals you weren't involved with

[7] Gersh was serving as respondent's talent agency. (Tr. 37-38).

otherwise. 3. August 15 – October 15 – You get 5% on any deals that are with companies you either previously got deals for Erin with or m[ade] introductions to. But no commission on deals you weren't involved with otherwise." (JX 1, March 4 email). In a follow-up email on March 6, Mr. Lichy proposed that Brigade cease representation activities "now (putting aside the termination date of May 15 aside—still would honor that for commission purpose . . .)." (JX 1 (March 6 email).[8]

If accepted, the net effect of the Lichy proposal on post-termination commission payments would have been threefold. First, it would reduce by half the percentages applicable to commissionable deals during the First and Second Follow-On Periods. Second, it would reduce the universe of commissionable deals from all endorsement deals to only those in which Brigade had some involvement or involved a company with which Brigade had made a prior deal for Ms. Lichy or had made an introduction for her. Third, it would reduce the length of the Second Follow-On period by one month.

After promising to "get back to you soon" (JX 1, March 5 email), Mr. Stein responded to the March 4 proposal by email on March 11, 2024, stating: "We have discussed and are okay to proceed with your proposal's percentages and dates." (JX 1, March 11 email). Having provided that limited approval -- covering percentages and dates but not Mr. Lichy's definition of the universe of deals that would trigger a commission -- he went on to define a notably different standard from the March 4 email: "I attached a list of companies (agencies and brands) that Brigade was in touch with on behalf of our clients during the period in which we represented Erin. We expect the commission percentages that you have listed to be paid on any and all deals with these entities, and in the case of multi-brand agencies, on any deal with any client of that agency." (Id.). In the same email, he directed that Ms. Lichy was to send reports monthly "for the months March 2024 through October 2024", with payments to be "made promptly thereafter." (Id.). While noting his willingness "to

[8] This reference to an end date for Brigade's services responded to an email inquiry by Mr. Stein a day earlier, in which he inquired whether there is "a date that Erin wants to stop our services . . . ." (JX 1, March 5 email).

proceed with your proposal", he reserved all of Brigade's rights under the Representation Agreement. Finally, he advised, "regarding the stop work/end of rep", that "we can do that as of today as requested." (Id.).

This exchange reflects that while Brigade was willing to reduce its commission percentages by half for the First and Second Follow-On Periods and seemed to accept the reduction of the Second Follow-On Period by one month,[9] it was not willing to narrow the universe of commission-triggering deals as substantially as respondent was proposing. As the Stein email made plain, instead of limiting the commissionable universe to companies with which Brigade had made deals for Lichy or with which it had made an introduction for her, claimant was offering to reduce the universe from all companies to those companies with which it had been "in touch . . . on behalf of our clients" during the period of its relationship with Ms. Lichy, a list that encompassed approximately 2,000 entries. (See RX 1).

This difference was apparent to Mr. Lichy, who promptly responded two days later, making clear that respondent objected to what Mr. Lichy saw to be "a blanket list of companies you guys sent an email blast out to." He contrasted that list with what he claimed was more typical for post-termination compensation provisions, "involving companies that you submitted offers/they submitted offers while you worked with Erin, or of course if there was a pending deal or some negotiation for a deal during the term itself." (JX 2, March 13 email). In short, respondent was still pressing for a commissionable universe similar to, but somewhat narrower than, his original proposal -- which was for commissions only for post-termination deals with companies with which Brigade had made an earlier deal for Ms. Lichy or had made an introduction for her, or any deal with which Brigade was involved.[10]

---

[9] Mr. Stein testified that he had not realized until now that Mr. Lichy's reference to October 15 as the closing date for commissions amounted to a one-month reduction of the Second Follow-On Period. (Tr. 42-43). That lack of awareness does not itself excuse a party from the consequence of agreeing to a contract, though it may be relevant to issues of intent.

[10] Respondent asserts that Mr. Stein misstated the nature of the list, indicating that it identified entities to which Brigade had reached out specifically on behalf of Ms. Lichy. (Resp. Brief, 5-6; RX 10). The description in Mr. Stein's March 11 email accurately described the list as encompassing

This effort by Mr. Lichy was firmly rebuffed by Mr. Stein in a responding email the same day, in which he emphasized his continuing reliance on some of the provisions of the Representation Agreement. In that message he said: "I am sorry if the structure of the representation agreement is not typical of what you have seen otherwise, but the language of the agreement is clear, and they are the terms that we all bargained for and agreed to from the start. The list of companies is based on our record keeping, and is the best we can offer." He further denied that Brigade employs email blasts. (JX 2, March 13 email).

This dispute between the two sides over their respective proposals, each of which would have modified paragraph 2 of the Representation Agreement in different ways, was never resolved. Indeed, the same dispute surfaced in September 2024, when Brigade sought revenue information for six deals entered into by Ms. Lichy. In an apparent reference to the March exchange, Mr. Lichy questioned Brigade's demand for commission-related data, seemingly harkening back to his March 4 proposal, which Brigade had rejected, and Brigade's proposal, which Mr. Lichy had rebuffed. Thus, he complained that only three of the six deals targeted by Brigade were with companies included on Brigade's March 11 list and that he believed that Brigade had never spoken, on behalf of Ms. Lichy, to any of the six companies. (CX 22 (Sept. 18 emails (2:38 & 5:25 p.m.)). Mr. Stein responded the same day that all six were on the March 11 list but that in any event the Representation Agreement required payment of commissions for all deals that respondent entered into during the 180-day post-termination period. (CX 22, Sept. 18 email (7:28 p.m.).[11] At that point, rather than debate the terms discussed in the March emails, the parties were resorting to their respective interpretations of the Representation Agreement itself. That dispute, later embodied in the original pleadings in

outreach for all Brigade clients, and that description was confirmed by Mr. Stein at the hearing. (Tr. 45-50). Moreover, respondent was plainly not misled as to the general nature of the list, as reflected in Mr. Lichy's March 13 email, referring to "an email blast" sent to "a blanket list of companies."

[11] This assertion by Mr. Stein reflected a step away from Brigade's March 11 position, in which Mr. Stein had linked commissions to an appearance of the company on the Brigade list. That is not surprising, since respondent had rejected Brigade's position on this issue from at least Mr. Lichy's March 13 email.

this proceeding, devolved into Brigade asserting that it was entitled to commissions on all deals within the 180-day post-termination period, as per the Representation Agreement, and Mr. Lichy insisting that post-termination commissions were to be paid, under that Agreement and some version of industry practice, only for deals in which the manager (that is, Brigade), "had a meaningful involvement." (CX 22 (Sept. emails (6:41 & 8:43 p.m.)). Based on respondent's reading of the Agreement, Ms. Lichy ended up not paying any of the commissions for which Brigade was seeking payment, thus triggering this litigation. (Tr. 46).

This history makes clear that there never was an agreement between the parties as to a modified definition of the universe of endorsement deals that should trigger a post-termination commission. Necessarily, then, the operative definition of that universe is found in the Representation Agreement, which -- as we determined in the Partial Interim Award -- embraces all such deals from that period. These circumstances also pose the question whether the failure to achieve agreement on that issue, by itself, precludes enforcement of Brigade's March 11 acceptance of the two other proposals (dates and percentages) on which Mr. Stein initially signaled approval of respondent's March 4 suggestions. The answer to that question in turn rests on whether that approval by Mr. Stein was contingent on agreement as to the entirety of the issues addressed by the parties in their March 2024 interchange.

The March 4 and 11 emails do not provide a clear answer as to the intent of Mr. Stein on this question, although claimant argues in general terms that there was no binding amendment of the Representation Agreement. Brigade also argues that even if there was a presumptively cognizable agreement by it on those two issues -- that is, that Brigade intended to be bound on dates and percentages even absent agreement on the commissionable universe -- that agreement is unenforceable for lack of consideration and the absence of a qualifying signed written document.

On the first point -- Brigade's intent regarding its acceptance of Mr. Lichy's proposed dates and percentages -- as noted, there is a lack of clarity in the evidentiary record, including the relevant emails, although Mr. Stein pointed to wording in his March 11 email that could be read

to support conditioning the percentage proposal on claimant's demand to apply the Brigade list. (Tr. 46-47).[12] In any event, it is plausible that Brigade at least expected complete agreement on all three topics raised by Mr. Lichy's March 4 email, as a predicate for enforcing the two items on which Mr. Stein voiced agreement. In addition, in his March 11 email, he reserved Brigade's rights while agreeing on dates and commission rates, and in the face of stalemate on redefining the universe of commissionable deals, he reiterated in the September 18 email exchange that the original Representation Agreement governed the definition of that universe -- thus effectively withdrawing Brigade's March 11 offer on that topic. That said, at no point did Brigade communicate to Mr. Lichy with specificity that its agreement on percentages and dates was contingent on agreement about the universe of commissionable deals. In addition, we note that the absence of agreement on that issue did not disadvantage Brigade; indeed, it benefited claimant, as the original provision -- requiring commissions on all post-termination deals -- was broader than Brigade's own March 11 proposal to define the universe by the list that it supplied to Ms. Lichy. Finally, claimant's briefing seems to acquiesce in the recognition that it had in fact approved the respondent's proposals on dates and commission rates, and it thus focuses its argument for non-enforcement of these two March 11 concessions on the asserted absence of consideration and a signed writing. For present purposes, we will indulge the assumption that claimant's agreement on percentages and dates was not contingent on agreement regarding the March 11 list as defining the scope of commission eligibility.

We turn then to the question of consideration. To define some form of cognizable consideration in this transaction, respondent points to the agreement to end Brigade's representation services immediately in March 2024, rather than continue them to May 15, as the Representation Agreement provided. (JX 1 & 2 (March 5, 6 & 11 emails)). Since the amount of commissions for this period was not to be affected by this alteration, respondent characterizes this arrangement (discussed and

[12] The cited language is: "We expect the commission percentages you have listed to be paid on any and all deals with these entities." (Tr. 46-47).

adopted more or less in parallel with the March 4, 11 and 13 exchanges about modifying the Representation Agreement) as a net benefit to Brigade. (Resp. Rebuttal, 7). Claimant opposes, asserting that the early termination was requested by respondent and did not benefit Brigade, which would have been happy to continue to represent respondent for the additional two months. (Cl. Brief, 13).

In enforcing the requirement of consideration, the courts exercise substantial liberality in finding it satisfied. "'So long as a contract provides some consideration, it may be minimal - even a peppercorn. Courts do not inquire into the value or adequacy of the consideration.'" Go Global Retail, LLC v. Dream On Me, Inc., 2025 WL 2771607, *5 (S.D.N.Y. Sept. 26, 2025)(quoting RLS Assocs., LLC v. United Bank of Kuwait PLC, 380 F.3d 704, 709 (2d Cir. 2004)).[13] In this case, it can fairly be argued that the adoption of an earlier date for termination of Brigade services was a net benefit for Ms. Lichy, especially in view of her stated criticisms of the quality of Brigade's services. (Tr. 172-73; see Amended Answer, 2-3). That said, the early termination, on its face, relieved Brigade of the burden of performing services for Ms. Lichy and without impacting Brigade's revenue. (Tr. 172). Moreover, although there is an argument that this provision was not intended as a quid pro quo for Brigade as part of an agreement to modify the Representation Agreement[14], it functions as an admittedly minimal benefit to Brigade, and that should suffice to qualify it as at least a peppercorn, and thus satisfy the modest requirement of a form of consideration, even though it was proposed separately from the March 4 email and characterized as a general benefit to both sides.[15]

As for the requirement of a writing signed by both parties (Representation Agreement, para. 19), there is no dispute that the only writings that address the terms of an asserted amendment consist of the unsigned emails between

---

[13] The Court in RLS was applying United Kingdom law, but that standard is also applied under American law, as in Go Global.

[14] It was Mr. Lichy who opined: "I think it's cleaner to stop work/rep now." (JX 2, March 6 email).

[15] In substance, the agreement on this point deprived Ms. Lichy of representation by Brigade for two months and allowed Brigade to avoid whatever burden there might have been from representing her for an additional two months.

Mr. Lichy and Mr. Stein. Claimant cites this circumstance as a violation of paragraph 19, and as mandating non-enforcement of the agreement to modify the dates and commission percentages in accordance with the March 4 and 11 emails. (Cl. Mem., 12; Cl. Reply, 10)(citing Eaglehill Genpar LLC v. FPCG,LLC, 188 A.D.3d 527, 529, 136 N.Y.S.3d 238 (1st Dep't 2020))[16]. Although the question is not straightforward, we agree with claimant.

In various contexts, notably for the Statute of Frauds, the New York courts have recognized the use of emails that sufficiently identify the provisions or modifications that are agreed to and that contain the name of the party at the bottom of the email as generally sufficient to satisfy a requirement for a signed writing if the context suggests that intent on the part of the signatory. See, e.g., Newmark & Co. Real Estate Inc. v. 2615 East 17th Street Realty LLC, 80 A.D.3d 476, 477, 914 N.Y.S.2d 162 (1st Dep't 2011); Agosta v. Fast System Corp., 136 A.D.3d 694, 695, 26 N.Y.S.3d 534 (2d Dep't 2016); Williamson v. Delsener, 59 A.D.3d 291, 291, 874 N.Y.S.2d 41, 41-42 (1st Dep't 2009); Stevens v. Publicis S.A., 50 A.D.3d 253, 254-55, 854 N.Y.S.2d 216 (1st Dep't 2008). Cf. Solartech Renewables, LLC v. Vitti, 156 A.D.3d 995, 999, 66 N.Y.S.3d 704, 708-09 (3d Dep't 2017). Insofar as this litigation involves emails rather than hard-copy documents, we assume the relevance of this caselaw to a contractual provision that specifies the requirement of a signed writing. We nonetheless emphasize that in the case of a contractual requirement of a mutually signed writing, the wording of the contract should control.

In this case the March 4 email from Mr. Lichy contains terms proposed by him, not terms purportedly agreed to by both sides. It also does not contain a typed name at the base of the email. The March 11 email from Mr. Stein contains a glancing reference to two categories of terms to

[16] Eaglehill appears not to stand for the general proposition for which claimant cites it. Nonetheless, the caselaw reflects a willingness by the courts to enforce provisions mandating a signed writing reflecting the terms on any contractual amendment. See, e.g., Israel v. Chabra, 12 N.Y.3d 158, 167, 878 N.Y.S.2d 646, 651-52 2009)(discussing NY GOL sec. 15-301(1)); Gootee v. Global Credit Servs., 139 A.D.3d 551, 553, 32 N.Y.S.3d 105, 108 (1st Dep't 2016); see also Kolchins v. Evolution Markets, Inc., 31 N.Y.3d 100, 107, 73 N.Y.S.3d 519, 524 (2018) ; Scheck v. Francis, 26 N.Y.2d 466, 469-70, 311 N.Y.S.2d 841, 843 (1970).

which he agrees, but the specification of those terms, as proposed, is found only in the March 4 email, and the scope of Mr. Stein's adoption of "dates" and "percentages" is not entirely clear.[17] Moreover, the balance of the March 11 email contains a discussion of still another proposed term for the same contract, newly outlined by Mr. Stein, and the fate of which is not evident from that email. Furthermore, the March 11 email, while agreeing to two terms and proposing a third in lieu of the proposal of March 4, does not specify whether Brigade intended that the two agreed-upon proposals would be binding absent agreement on the third issue. We view these gaps as sufficient to bar treating the March 11 email, whether alone or in combination with the March 4 email, as satisfaction of the contractual requirement of a writing signed by both sides that memorializes an agreed set of terms. The March 11 email reflects an ongoing negotiating process; it does not show with clarity the extent and substance of an agreed-upon set of amendments and leaves open the final shape of any such agreement. That the parties were still disputing the extent and substance of the proposed amendments on March 13, and then as late as September 18, and by then both reverting to their respective interpretations of the original Representation Agreement underscores the inadequacy of the March 11 email to serve as a substitute for a mutually signed writing that accurately explains the amendments that the parties had definitively agreed to.[18]

Respondent's back-up argument seems to be that the conduct of the parties after the March exchange of emails is "unequivocally referable" to the new terms, thus excusing the absence of an otherwise required signed writing. (See Resp. Brief, 8-9; Resp. Reply, 5)(citing Rose v. Spa Realty Assocs., 42 N.Y.2d 338, 397 N.Y.S.2d 922 (1977)). To satisfy this requirement, we look for evidence that the parties engaged in post-agreement conduct that is both consistent with the allegedly modified terms and

[17] For example, the approval of "percentages" might, at first blush, include Mr. Lichy's proposal of a zero percent absent Brigade's involvement in certain deals or contacts, but Mr. Stein's insistence on use of his March 11 list clarifies that he is not agreeing to those terms from Mr. Lichy that narrowly define the universe of commissionable deals.

[18] We infer that if Brigade had proposed that Ms. Lichy co-sign the March 11 email to satisfy the writing requirement, she would have declined, since that email contains the demand that the parties use the Brigade list to determine the universe of commissionable deals.

inconsistent with the prior terms. We find no evidence proffered by respondent that satisfies such a requirement. For example, regarding the proposal for a percentage reduction, we see no evidence that, post May 15, claimant demanded and received commissions at half the prior rate; indeed, it appears that respondent was not even paying commissions after that date. Respondent does assert that, after May 15, "Mr. Stein confined his commission demands only to companies appearing on the March 11 list, even when the reports reflected other companies not on that list, confirming that he understood and applied the March qualifier. These actions demonstrate mutual implementation of the March modification and satisfy Rose's 'unequivocally referable' standard." (Resp. Brief, 9-10; see also Resp. Rebuttal, 14-15). Respondent cites no evidence for these assertions. Moreover, Mr. Lichy himself contradicted his own current assertion that claimant limited itself to the March 11 list, as he complained on September 18 that Brigade was seeking commissions for deals with three brands that were not on the list. (CX 22, Sept. email (2:38 p.m.)). In any event, respondent's argument fails since there was no agreement between the parties concerning the use of that list, which respondent objected to in March and continued to reject in September.

As a related matter, respondent points to the fact that in the March 11 email, Mr. Stein asked for revenue reports for the period ending in October 2024, implying that this demonstrates claimant's performance acquiescing to the shortening of the Second Follow-On Period by one month. (Resp. Rebuttal, 8). The invited inference is misguided. The quotation is from the March 11 email, which reflected Brigade's reaction to, and acceptance of, the dates relevant to the First and Second Follow-On Periods, but it certainly does not reflect performance by claimant that amounts to confirmation that it was in the process of implementing a provision from the March 4 email from Mr. Lichy. It is not disputed that Brigade approved of aspects of the Lichy March 4 proposal, but performance of them appears to have been foreclosed early on by disagreements between the parties about a significant part of the original proposal and counterproposal. That says nothing about whether Brigade was agreeing to accept commissions only through October 15 (rather than through November 15)

despite that disagreement. Finally, as it turned out, Ms. Lichy paid no commissions through the Follow-On Periods, thus undercutting the rationale for the submission of revenue reports and the proposed inference that both parties were performing consistently with the one-month reduction of the Second Follow-On period.

In sum, respondent fails to demonstrate that the parties engaged in conduct unequivocally referable to the proposed amendments pressed in Mr. Lichy's March 4 email. Accordingly, the failure to provide a mutually signed writing embodying with clarity the amendments assertedly definitively agreed to by the parties precludes enforcement of those amendments.

Waiver & Estoppel

Respondent presses two other theories for favorable relief. Neither merits it.

Waiver: In respondent's initial brief, it cites the fact that, prior to the notice of termination, Brigade had agreed to split its commissions with Ms. Lichy's talent agent. (Resp. Brief., 12-13)(citing RX 8 & 9; see Tr. 36-40). From that fact, respondent draws the inference that it was appropriate to demand that claimant agree to split its commissions in the pre- and post-termination periods with a new manager, and that Brigade's practice involving the talent agency should be deemed a waiver by Brigade, compelling it to agree to split post-termination fees with anyone who brought in a deal. This is meritless. First, it ignores the wording of the Representation Agreement and the Partial Interim Award, which definitively addressed the entitlement of Brigade to commissions during the First and Second Follow-On Periods. Second, the proposal by Lichy for fee sharing with a new manager or talent agency was for the period preceding May 15 -- that is, pre-termination -- whereas this litigation is limited to the post-termination Follow-On Periods. (See Scheduling Order No. 7, para. 5(2)(a)). Third, Mr. Stein testified that fee splitting is done by Brigade only with licensed talent agencies (in this case respondent was represented by two agencies -- WME and then Gersh), and respondent cites no evidence that either was involved in the deals currently at issue. (See Tr. 166-69). Finally, as noted, the parties' rights and obligations are defined by contract, and there is no evidence that

following its execution, Brigade engaged in any conduct reflecting an intention to surrender its contractual rights other than what is stated in Mr. Stein's March 11 email, and that representation would not compel fee splitting by Brigade in these circumstances.

In respondent's reply, she offers a similar waiver theory, citing again the fact that Brigade had shared fees "with agents who sourced opportunities". (Resp. Rebuttal, 14-15 (citing Tr. 34-35)(referring to licensed talent agencies)). She then goes on to assert that this precludes Brigade from receiving unreduced fees post-termination, when it no longer provided services to her. (Id., 15). Again, this claim is baseless. Brigade's entitlement is defined by contract, and no evidence suggests a waiver by claimant.

Equitable Estoppel: Respondent's estoppel theory mirrors her waiver argument, only arguing that Brigade's past practice of fee-sharing induced reliance by Ms. Lichy, causing her both to assume that claimant would relinquish half its commissions and to decide to pay full fees to her new manager, AIRE, when her normal practice would be to pay a second manager half fees. (Resp. Reply, 15). The short answer is that the cited reliance was not reasonable, since the Representation Agreement gave Brigade the right to full commissions for 90 days -- the First Follow-On Period.

Contract Breach & The Amazon Opportunity

Respondent's breach claim rests in part on general assertions of performance inadequacy delinked from any specifics or persuasive evidence. (See, e.g., Resp. Rebuttal, 13). The only specifics concern (1) a misstatement by Mr. Stein about the March 11 list (see n.10, supra)[19] and (2) the alleged loss of an opportunity to be hired for an Amazon event in late 2023.

On the matter of the list, as we have noted, Mr. Stein accurately characterized it when he first introduced it on

[19] In an answer to an interrogatory, claimant characterized the list as including entries for "the brands with which it had contact on [Mrs. Lichy's] behalf." (RX 10, (i)). As noted by Mr. Lichy in his March 13 email, and as revealed by Mr. Stein in his March 11 email and as testified by him at the hearing, the list included entries pertaining to all of the company's clients and was not specific to Mrs. Lichy.

March 11. Moreover, as evidenced by Mr. Lichy's responding email on March 13, he plainly understood its general nature -- that is, encompassing contacts for all clients, and not specific to Mrs. Lichy.

As for the Amazon affair, the evidence does not demonstrate a breach by Brigade. On October 3, 2023, Jordana Lanz, of Autumn Communications, an agent for Amazon, emailed Mr. Stein, advising "We're interested in Erin Lichy attending Amazon's annual holiday event", and asking about her rates for a possible appearance. (RX 5). In that email, Ms. Lanz listed the expected scope of "[d]eliverables" -- that is, the scope of services and conditions expected in connection with that event[20] -- and requested a "ballpark budget for the below scope." (Id.). Ms. Lanz went on to caution that this was "[n]ot an offer, just trying to gauge rates." (Id.).

In response, Mr. Stein requested, and received, some details about the extent of the performance that would be required and the handling of rights and other information pertinent to value. Based on those details, he then asked "Is 100K in the realm of possibility?" Ms. Lanz responded: "I can talk to the client for a general range but that's most definitely above budget." (Id.). Given that response, Mr. Stein struck a very conciliatory tone, seeking very gently to elicit some lower rate or range: "It is hard for me to give a rate because Erin has not done anything this comprehensive with anyone as big as Amazon yet, and in the past we have done a few deals with Amazon Luxury Stores that have been enormous in terms of rates. Would love to make something work, so if you can come back to me with a target, I will do my best." (Id.). Ms. Lanz responded, assuring "Totally understood", and promised to confer with the client and get back to Mr. Stein. From October 3, silence reigned until October 19, a silence punctuated by numerous check-up calls from Brigade. (Id.). Finally, on October 19 Ms. Lanz apologized for the delay, and advised that the client "ultimately decided to move in a different direction for this one but we will continue to keep you posted on potential opp[ortunities] for Erin!". (Id.).

[20] These items included the length of, and required performance at, the event itself, the social media coverage required, usage rights by Amazon of social media, and exclusivity. (RX 5).

Respondent claims that by asking about a fee as large as $100,000, Mr. Stein ruined her chance to be selected for the Amazon event, and she further alleges that by not advising her of the Amazon contact before asking about Amazon's budget plans, Mr. Stein violated his obligation to consult her before quoting what she deems to be an unreasonably ambitious figure. Accordingly, she asserts breach as an affirmative defense, and urges that any recovery of commissions by Brigade be reduced as a setoff for the amount that she hypothesizes she would have earned had she been selected for the holiday party.

This claim (at least in substance a claim rather than a mere defense), is meritless. Respondent fails to demonstrate that Mr. Stein denied her the basic competent and unconflicted services mandated by the Representation Agreement. When asked by Ms. Lanz for an estimated budget, he avoided committing Ms. Lichy to a specific figure and simply asked whether $100,000 was possible. Moreover, he testified credibly that he was influenced in this respect by a deal that Ms. Lichy had recently entered into with another company (known as Xeomin) for $130,000 for what he characterizes as roughly similar services (Tr. 84-85), and some information that he had about Amazon's going rates. (Tr. 87). As for not informing Ms. Lichy about the contact before asking about $100,000, Mr. Stein reported that Brigade's general practice was to discuss with the client only when, and if, the brand made an offer, a practice generally favored by at least some of Brigade's clients. (Tr. 88-90).

The debate between the parties as to how similar (or not) were the conditions of the Amazon opportunity and the Xeomin agreement is ultimately not dispositive of the contract-breach theory. Respondent offers no legal authority for the notion that a business manager is bound to avoid misjudging the willingness of a potential customer for the rate that the manager quotes. Moreover, in this case Mr. Stein did not even quote an amount, but rather simply asked about the possibility of $100,000, and, upon being told that this was above budget, did his best to keep the contact with Autumn alive, inviting Ms. Lanz to come back with whatever figure Amazon's decision-makers were

comfortable with, and Brigade then pursued Autumn avidly over several weeks.[21]

A business manager is not a guarantor of success in pursuing any potential business opportunity, and in this case the evidence reflects no divergence from proven professional standards; indeed, respondent offers no evidence of such industry standards. Ms. Lichy's argument, insofar as premised on the lack of consultation, also fails, as Mr. Stein's testimony about standard practice by Brigade is not meaningfully contradicted, and seems defensible, particularly in light of evidence that initial feelers for influencers often peter out or change substantially from the first approach. Finally, respondent's theory rests on the assumption that if Brigade had quoted a lower rate, or consulted Ms. Lichy, Amazon would have hired Ms. Lichy. Absent that assumption, respondent fails to show damage, and in this case her assumption rests on pure and unvarnished speculation.[22]

In short, the contract-breach theory fails on multiple fronts.

Remedies

In light of the foregoing, Brigade is entitled to compensatory damages sufficient to cover the proven commissions owed. Based on the data stipulated to by the parties concerning the revenues that respondent received for endorsement deals during the First and Second Follow-On Periods, claimant is owed commissions of $43,710.00 in compensatory damages.

Claimant seeks, and is entitled to, prejudgment interest, under N.Y. CPLR secs. 5001 and 5004, at a rate of nine percent per annum on the amount of compensatory damages. Under CPLR sec. 5001(b), we adopt claimant's proposal that an intermediate start date for accrual of

[21] Mr. Stein testified that he prefers to get a budget from a brand rather than having to quote a demand on his client's behalf, thus avoiding the risk of an excessive bid. (Tr. 94). In this case, Autumn did not disclose its budget, leaving Mr. Stein to put a number on the table, although he tried to limit the risk by asking whether "100K" was "possible", thus avoiding making an initial demand.

[22] It also bears mention that Ms. Lichy's husband and counsel, Mr. Lichy, was counsel to Autumn Communications, and apparently was unable to persuade his client to hire his wife. The nature of his efforts in this direction, if any, are not reflected in the record.

interest is August 15, 2024, the first day of the Second Follow-On Period. Interest will accrue until the date of the issuance of the final award, absent prepayment of damages.

During the period of this arbitration, claimant has advanced payments of various sums on behalf of respondent to cover JAMS fees, compensation and expenses. That figure, which is still to be calculated, is properly made an element of recovery by claimant against respondent and therefore is to be included in the award in this case. (See JAMS Streamlined Rule 26(c)).

Finally, we award claimant its own arbitral expenses incurred following the issuance of the Partial Interim Award. In making this allocation, we take into account the relative strengths of the parties' respective arguments addressing the interpretation of the Representation Agreement.

Claimant may file an application for quantification of pre-judgment interest, and arbitral fees and expenses, with accompanying documentation, within two weeks. Respondent may respond within one week thereafter. Any reply by claimant will be due within three business days after receipt of respondent's response.

* * *

QUANTIFICATION OF INTEREST AND ARBITRAL EXPENSES

The Second Interim Award approved claimant's requested entitlement to pre-judgment interest, under the CPLR secs. 5001 and 5004, at nine percent per annum, with a start date of August 15, 2024. (2d Interim Award, 26). Claimant calculates accrued interest as of February 10, 2026 as $5,734.96, with daily increments at $10.78. (Resp. Feb. 10, 2026 Mot., 1). As of February 24, 2026, interest totals $5,885.88. Respondent does not contest this calculation of pre-judgment interest or claimant's entitlement to payment of that figure. (Resp. Opp., passim.).

As for arbitral expenses, in Brigade's initial papers it documents its payments to JAMS on its own behalf as $28,094.00, which it seeks under Streamlined Rule 19(e), and it calculates its advances to JAMS on account of Ms. Lichy at $18,918.40, which it seeks to recover under JAMS

Streamlined Rule 26(c). (Fox Aff., paras. 3-6 & Exs. A & B). In the interim, JAMS billed the parties one additional, and final, charge of $2,824.00, which Brigade paid in its entirety. (Feb. 23, 2026 letter from Peter Fox, Esq.). Thus the total figures for claimant's payments on its own account and its advances for respondent are increased to $29,506.00 and $20,330.40, respectively.

Respondent does not dispute these calculations, but she seeks either a reduction of $17,980.00 or outright denial of both of these amounts. (Resp. Opp., 2-7). She grounds that effort in the contention that most of the challenged fees are for work either beyond the scope of reimbursable expenses (which she seems to limit to activity directed specifically at the merits of her affirmative defenses), or involving what she characterizes as claimant's abusive and unsuccessful motion practice. She argues that it would be unfair to burden her with the expenses of these unjustified ventures. Alternatively, she asserts, as a matter of equity, that fee reimbursement should be denied because her interpretation of the Representation Agreement was correct or at least consistent with industry practice. (Id., 7-8).

Claimant responds principally that respondent waived these arguments by not raising them immediately post-hearing in briefing the Second Interim Award, or that they are barred by law of the case, given the wording of the Second Interim Award authorizing payment of claimant's arbitral expenses. (Cl. Reply, 2-6). Alternatively, claimant asserts that the attempt to achieve a partial or complete denial of fee reimbursement is not justified on the merits, insisting that respondent was responsible for the extended proceedings and expenses, since she should have conceded her contractual obligation to pay commissions to Brigade following the Partial Interim Award issued July 2 of last year rather than asserting a set of affirmative defenses that have since been denied on the merits.(Id.).

We initially focus on the wording of JAMS Streamlined Rule 19(e), which provides that the Arbitrator "may allocate Arbitration fees and Arbitrator compensation", terminology that vests the arbitrator with discretion to shift some or all of the prevailing parties' arbitral financial burden to the other side. Applying that

understanding in the Second Interim Award, we simply ruled that claimant was to be entitled to an award of fees, with the calculation, or "quantification", to be determined at the next, and final, stage of this proceeding. That process commonly involves only a mechanical procedure of simply totaling the fees charged and paid for by the prevailing party and requiring the shifting of those fees to the adversary, but that process may involve litigation of whether and to what extent the arithmetical total should be adjusted -- a concept consistent with our understanding of the term "allocate".[23] In this case, our wording in the Second Interim Award was intended simply to determine that claimant is to be granted arbitral fee-shifting, without intending to foreclose arguments about the amount of fees to be subject to reimbursement. Indeed, claimant itself at one point seems to echo this understanding when it states: "Following the hearing (and post-hearing briefing), the Arbitrator decided -- consistent with Scheduling Order No. 3 -- that Brigade is entitled to reimbursement of some of its arbitrable expenses." (Cl. Feb. 10 Mem., 5). With this understanding of the intended scope of our prior ruling, we decline to find that respondent waived her argument for a limit on fee reimbursement or that her effort is barred by law of the case.[24] That said, we apply a stringent test designed to weed out from fee-shifting only projects that, in our view, lacked a colorable basis and that triggered such a significant amount of fee-generating work that it would be unfair to saddle the other side with the financial burden of underwriting such wasted time.

As for the merits of respondent's opposition to fee-shifting, we first reject her argument that any fee-generating work on matters that did not involve the merits of her affirmative defenses should not be compensated. We further reject respondent's apparent notion that fees for

[23] This process may be compared to the litigation of attorney's fees in cases in which such fees are subject to statutory or contractual fee-shifting; typically, the court will conclude that one side is the prevailing party and rule that it is entitled to fee shifting, but the quantification of such an award awaits a subsequent argument, including determination of whether portions of the total fees should be ineligible for remediation for any of a variety of reasons. See, e.g., Hensley v. Eckerhart, 461 U.S. 461 U.S. 424, 433-37 (1983); Gierlinger v. Gleason, 160 F.3d 858, 876 (2d Cir. 1998).

[24] We further decline respondent's invitation to revisit the meaning of the Representation Agreement. That issue was initially decided in the Partial Interim Award, and at the arbitral hearing respondent failed to offer competent evidence of a contrary industry practice.

any work triggered by a claimant's motion that was ultimately unsuccessful should also be ineligible for reimbursement. Of the five categories of work that respondent targets for exclusion from arbitral fee-shifting[25], we reject respondent's argument on all but one. The exception is a last-minute motion to disqualify respondent's counsel, a motion filed in the face of our warning that we almost certainly lacked jurisdiction to address it and that proved to be filed in the wrong forum and in any event to be meritless, and which we characterized as evidently intended "in order to secure a tactical advantage or to force a settlement." (Scheduling Order No. 9, p. 7)(quoting Homar v. Am. Home Mort. Acceptance, Inc., 119 A.D.3d 901, 901, 990 N.Y.S.2d 250, 251 (2d Dep't 2014)).[26] The costs of a motion so lacking in merit should not be visited upon the victim of such conduct.[27][28]

The added expense of the disqualification motion in arbitral fees amounts to $7,800.00. That expense represents an obligation that was to be borne equally by claimant and respondent, but was apparently paid for solely by claimant. Accordingly, we impose a reduction of $3,900.00 to claimant's requested reimbursement under both Rule 19(e), covering claimant's own expenses, and Rule 26(c), covering claimant's advances for respondent. That yields a net award to claimant for its own arbitral expenses of $25,606.00, and an award of $16,430.40 for its advances, in short, a combined total fee reimbursement of $42,036.40.

---

[25] The five categories encompass follow-up work linked to the Partial Interim Award, several discovery motions by both sides, a second application for leave to move for summary disposition (and related work), a motion to disqualify respondent's counsel, and a congeries of motions (an in limine motion, and a motion to amend and a request for trial subpoenas).

[26] As we observed in our extended ruling, the motion was filed only two weeks before the arbitral hearing despite the fact that claimant was aware months before of the facts on which claimant premised its motion.

[27] This conclusion is equally applicable to an award of advances, as Rule 26(c) equally leaves to the arbitrator's discretion the making of such an award and its calculation. ("In the event that one Party has paid more than its share of such fees . . . the Arbitrator may Award against any Party any such fees . . . that such Party owes with respect to the Arbitration.").

[28] We are not persuaded by claimant's argument that respondent should be denied this relief because she is responsible for the added expenses by virtue of her failing to surrender after the Partial Interim Award. Even though unsuccessful, her affirmative defenses pressed some litigable theories.

CONCLUSION

For the reasons stated, we award claimant, as against respondent, the following:

1. Compensatory damages of $43,710.00,
2. Prejudgment interest, at 9 percent per annum, of $5,885.88 as of February 24, 2026,
3. Claimant's own arbitral expenses in the amount of $25,606.00 and
4. Claimant's advances of arbitral expenses for respondent in the amount of $16,430.40.

TOTAL: $91,632.28

This Final Award resolves all issues submitted for decision in this proceeding.

Dated: February 24, 2026

*Michael Dolinger*

______________________

Michael H. Dolinger

Arbitrator

I, Michael Dolinger, do hereby affirm that I am the arbitrator described in, and who executed, the foregoing instrument, which is my award.

*Michael Dolinger*

______________________

Michael H. Dolinger

Arbitrator